UNITED STATES, Appellee

v

MARVIN HARRISON, Private, U. S. Army, Appellant

19 USCMA 179, 41 CMR 179

No. 22,145

January 9, 1970

*Captain Robert A. Savill* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Major James M. Yelton, Jr.,* and *Captain Lee A. Rau.*

*Colonel David T. Bryant* argued the cause for Appellee, United States. With him on the brief were *Major Edwin P. Wasinger, Captain Salvatore A. Romano,* and *Captain Herbert D. Miller.*

## Opinion of the Court

FERGUSON, Judge:

The accused was convicted by general court-martial, convened in Vietnam, of one specification of malingering, by intentionally shooting himself in the foot for the purpose of avoiding duty in the field, in violation of Article 115, Uniform Code of Military Justice, 10 USC § 915. As the case reaches us, his punishment extends to dishonorable discharge, total forfeitures, confinement at hard labor for two years, and reduction. We granted review to consider several issues which will be discussed below.

The first issue concerns the law officer's instructions on the affirmative defense of accident, placed in issue by the accused's testimony at trial. At the outset, the law officer outlined for the court the elements of the offense and told the members, in part, that in order to convict the accused, they must find that he "intentionally inflicted injury upon himself by shooting himself in the foot." With regard to the accused's testimony that the weapon discharged while he was dozing, the law officer instructed:

"In this case, the defense has raised the issue of accident. In other words, that this injury occurred as a result of an accident and

not as a result of any intentional act on the part of the accused. You are advised that this injury is excuseable [sic] if it was a result of an accident or misadventure in the doing of a lawful act in a lawful manner. Now, the accused has testified in this case that he was doing, I'm sorry, dozing off and on at the time that this accident occurred, and that he had a faulty weapon. That the safety did not work properly on his weapon sometimes. That the bolt did not seat itself properly. Further, we have the testimony of Specialist Warren I believe it was, who testified that the accused's head was dropping down periodically; indicating that he was dozing from time to time; indicating that at the time that this occurred, that the accused was dozing. Now, even though the act is unintentional, it is not excuseable [sic] where it was a result or incidental to an unlawful act. Now consequently, unless you are satisfied beyond a reasonable doubt that the jinjury [sic] was not the result of an accident or misadventure, then you must acquit the accused. Now, an accident is an unexpected act. It is not the unexpected consequence of a deliberate act."

It is apparent that by instructing the court that "even though the act is unintentional, it is not ██ excuseable [sic] where it was a result or incidental to an unlawful act," the law officer raised a conflict with his instructions on the elements. This accused was specifically charged with *intentionally inflicting injury upon himself*. If the act by which he sustained the injury was *unintentional*, an essential element of the charged offense is not present and the accused must be found not guilty. This is a basic principle of law.

The instructional conflict in this case was caused by the law officer's apparent reference to that portion of the suggested "Instruction on Accidental Homicide," Appendix XIX, Department of the Army Pamphlet No. 27–9, Military Justice Handbook: The Law Officer, April 1958, page 167, which states that "a homicide is excusable if it was the result of an accident or misadventure of the accused in doing a lawful act in a lawful manner." The converse logically follows that there will be no excuse if the act was the result of, or incidental to, an unlawful act. The difficulty, however, with the use of this instruction *in this case* is that it defines a standard for accident which is not applicable to the offense under consideration. Cf. United States v Torres-Diaz, 15 USCMA 472, 35 CMR 444; United States v Redding, 14 USCMA 242, 34 CMR 22. As we said in *Redding*, at page 246, " 'Accident,' in proper use of the term, excludes *negligence and wrongdoing*." (Emphasis supplied.) And in United States v Pemberton, 16 USCMA 83, 84, 36 CMR 239, "accident is not synonymous with unintended injury."

Trial defense counsel recognized the inconsistency in the instruction for when the law officer, in an out-of-court hearing, indicated he would instruct that the shooting was "not excuseable [sic] where it is the result of an accidental or unlawful act, in doing a lawful act in a lawful manner," defense counsel demurred and requested that the instruction not be given. The law officer denied his request.

While the instruction as given might be a correct statement of the law with regard to homicide, assault and related cases (paragraph 197c, Manual for Courts-Martial, United States, 1951; United States v Sandoval, 4 USCMA 61, 15 CMR 61; United States v Femmer, 14 USCMA 358, 34 CMR 138; United States v Redding; United States v Torres-Diaz; and United States v Pemberton, all supra), the fact is that it erroneously sets forth an improper standard for consideration of the defense of accident as it applied in this case. We have previously held that instructions correct in the abstract may be inadequate or misleading in the context of the specific issues involved. United States v Torres-Diaz, supra; United States v Weems, 3 USCMA 469, 13 CMR 25; United States v Thompson, 12 USCMA 438, 31 CMR 24; United States v Nickoson, 15 USCMA 340, 35 CMR 312. If there is room for reasonable doubt as to whether the court properly understood the instructions given, such doubt must be resolved in favor of the accused. United States v Sanders, 14 USCMA 524, 34 CMR 304; United States v McIntosh, 12 USCMA 474, 31 CMR 60; United States v Lombardi, 14 USCMA 466, 34 CMR 246. While we might ordinarily be inclined to invoke the instructions as a whole test, we find it inapplicable in a case, such as this, where two instructions on a material issue conflict with one being prejudicially erroneous. United States v Noe, 7 USCMA 408, 22 CMR 198; United States v Morphis, 7 USCMA 748, 23 CMR 212; United States v Alberico, 7 USCMA 757, 23 CMR 221.

We conclude, therefore, that the instruction was seriously defective in apprising the court of the appellant's defense and reversal is required. United States v Thompson and United States v Torres-Diaz, both supra.

Because a rehearing is in order, we must refer to the other granted issues, albeit briefly, because of their possible future impact on this case.

Appellate defense counsel contend that a directive by the convening authority, entitled "Gun Shot Incidents" (Appellate Exhibit III), issued some seven weeks prior to trial, constituted improper command influence and improperly limited the exercise of the independent discretion by subordinate commanders as contemplated by paragraph 32*d*, Manual, supra. The matter was aired at trial when defense counsel moved for a change of venue because of the directive. The motion was denied when each court member, who expressed knowledge of the directive, stated that it would have no effect whatever on his judgment of the case.

This Court has, in the past, found it necessary to condemn policy directives to subordinate commanders. See generally United States v Hawthorne, 7 USCMA 293, 22 CMR 83; United States v Wright, 17 USCMA 110, 37 CMR 374; United States v Cole, 17 USCMA 296, 38 CMR 94, and cases cited therein. And we have, on occasion, reversed even though the court members believed they would not be influenced in their determination of a particular case, because " 'jurors are human and not always conscious to what extent they are in fact biased or prejudiced and their inward sentiments can not always be ascertained.' See Stone v United States, 113 F2d 70 (CA6th Cir). Accord: United States v Adamiak, 4 USCMA 412, 15 CMR 412; United States v Rakes, 74 F Supp 645 (ED Va)." United States v Zagar, 5 USCMA 410, 414, 18 CMR 34.

In the case at bar, the directive is, in the main, essentially directed toward prevention of gun shot incidents, rather than prosecution, although some of its terms, when read out of context, might be taken to indicate to the contrary.[1] The subject matter is, however, within the proper exercise of the convening authority's responsibility. As stated therein, "The presence of our soldiers on the battle-field is essential to military success." As this Court stated in an analogous situation in United States v Carter, 9 USCMA 108, 114, 25 CMR 370:

> ". . . while a commander's motives may be unimportant if the methods he employs deny a court member freedom of thought, there is here a legitimate purpose which does not impinge on that liberty."

When the directive is read as a whole, we do not believe that this officer strayed beyond the limits of his responsibilities to his command. United States v Carter, supra.

The final issue concerns the sufficiency of the law officer's instructions on the voluntariness of the accused's pretrial statement. The question arose due to the fact that prior to the interview the accused, who was hospitalized at the time, received a shot of morphine to ease his pain. Appellate defense counsel alleged that this impaired his ability to understand the warning as to his right to remain silent under Article 31 and his right to counsel (see generally, United States v O'Such, 16 USCMA 537, 37 CMR 157, and United States v Tempia, 16 USCMA 629, 37 CMR 249), and that the instructions of the law officer were deficient in this area.

We need not decide the issue. It will suffice for the purpose of this opinion, since a rehearing is to be ordered, that we iterate our previous holding that the instructions on this or any issue be tailored to the facts and the evidence. United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Jones, 13 USCMA 635, 33 CMR 167. As we said in *Smith*, at page 474:

> ". . . What is contemplated is the affirmative submission of the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them."

In view of our holding that the law officer's instructions on accident were

---

[1] See Appendix.

seriously defective in apprising the court of the appellant's defense, the decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN and Judge DARDEN concur.

## APPENDIX

### FOR OFFICIAL USE ONLY

### DEPARTMENT OF THE ARMY
### HEADQUARTERS, 4TH INFANTRY DIVISION

APO San Francisco 96262

AVDDH-GA 5 May 1968

SUBJECT: Gun Shot Incidents

SEE DISTRIBUTION

1. It has been brought to my attention that during the past 3-½ months, 15 soldiers have suffered gun shot wounds which they have inflicted upon themselves with their own weapons. The fact that 9 of the 15 wounds were minor wounds of the foot suffered when no witnesses were present further causes me concern.

2. It is inconceivable that all of these incidents could be justifiably defined, within the accepted definition, as accidents. Further, a review of the facts and circumstances surrounding these cases reveals that the soldiers frequently exhibited dissatisfaction with their assignment, a despondent attitude, and generally low morale. The failure of leaders to recognize these indicators and to take appropriate action is a more serious oversight in these particular gun shot incidents than is failure to enforce weapons' safety.

3. The serious implications of these questionable "accidental" gun shot incidents must be brought to the attention of all junior leaders. Accordingly, I desire that commanders review the basic principles of leadership with their junior leaders with emphasis on the fundamentals of knowing their subordinates and caring for their health, welfare, and morale.

 a. An alert and responsive chain of command must detect indicators of personal problems, and low morale, and attempt to alleviate the situation before the individual becomes so despondent that he resorts to this device.

 b. Strong leadership at all levels, especially in the close relationship that must exist between soldiers and their squad and platoon leaders, will reduce self-inflicted wounds. Such leadership is an absolute necessity in combat.

4. When preventive measures fail and a self-inflicted wound occurs, commanders will initiate flagging action in accordance with AR 600–31. This will, in the case of in-country hospitalization, insure the return of the soldier for completion of disciplinary action and in other cases prevent favorable personnel action prior to appropriate disciplinary action having been taken by the gaining commander. In all cases where the soldier will be hospitalized for 30 or more days charges and supporting documents will be forwarded to the hospital commander.

5. I personally review the report of investigation of every self-inflicted gun shot wound, and pay particular attention to indications that leaders have not done their job properly. I expect commanders at all levels to take appropriate action to prevent these wounds and to aggressively take follow up action in each case which may occur. The presence of our soldiers on the battlefield is essential to military success. We can ill afford to have these men absent from essential duties due to gun shot wounds, accidents, or other preventable causes.

/s/CHARLES P. STONE
CHARLES P. STONE
Major General, USA
Commanding

DISTRIBUTION:

B

### FOR OFFICIAL USE ONLY